UNITED STATES, Appellee

v

DENNIS L. KIRKPATRICK, Airman Recruit,
U. S. Navy, Appellant

18 USCMA 302, 40 CMR 14

No. 21,560

May 9, 1969

*Lieutenant Commander E. M. Fulton, Jr.,* JAGC, USN, argued the cause for Appellant, Accused. With him on the brief was *Lieutenant David E. Miller,* JAGC, USNR.

*Lieutenant Matthew J. Wheeler, Jr.,* JAGC, USN, argued the cause for Appellee, United States. With him on the brief was *Colonel C. R. Larouche,* USMC.

## Opinion of the Court

QUINN, Chief Judge:

The accused married Dixie Diane Spence, who had been twice divorced and was the mother of two children. A month later, the accused left the marital household; five months thereafter the marriage was annulled. During the latter period, the accused had obtained possession of four United States Government checks drawn to Dixie's order. His handling of these checks led to his conviction on four charges of forgery, in violation of Article 123, Uniform Code of Military Justice, 10 USC § 923 (Charge II and its specifications). This appeal is concerned with the validity of these findings of guilty.

Dixie owned a house in Northridge, California. She was employed and supported herself and her children from her earnings and some "child support." Her premarital dating with the accused included a brief visit to a motel in Los Angeles about September 1966. Apparently just before the marriage, she and the accused considered the "finan-

**303**

cial situation" that would result from the marriage and determined that the allotment the accused could obtain from the military would be "part of . . . [their] financial affairs." The marriage took place in Las Vegas, Nevada, on October 2, 1966. Dixie testified that she paid the expenses for the trip, but the accused maintained he borrowed the money from a man whose surname he could not remember but whom he had known for "a long time." The accused gave Dixie a marriage band which cost either $36.00 or $39.00, but on which he paid only $9.00, as a down payment.

On returning from Las Vegas, the newlyweds established a marital home in Dixie's house in Northridge. On October 11, 1966, the accused completed an authorization for a monthly Class Q allotment of $95.20. Dixie was designated as the person in whose name the checks were to be drawn, and the Northridge address was listed as the place to which the checks were to be sent. Discord, however, soon beset the bride and groom. They gave different reasons for the disagreements. Apparently, one of the reasons especially important to the accused was that Dixie "wasn't capable of handling" money. At any rate, about November 1st, the accused left Dixie. It was understood by both that he would institute proceedings to have the marriage annulled.[1]

According to the accused, he attempted to stop the allotment, but was informed it would remain in effect until the annulment of his marriage was final. See 37 USC § 423. On November 29, 1966, he filed a form to change the address of "Mr. and Mrs. D. L. KIRKPATRICK" from Dixie's Northridge house to the home of his parents in Mission Hills, California, where he had established his residence. The accused testified he had several times asked Dixie to change her surname from Spence to Kirkpatrick "but she would not." He, therefore, knew that mail addressed to Kirkpatrick would be intended only for him, and he did not "want her getting any of" his mail, which he knew would include "bills" incurred as a result of the marriage. He did not tell Dixie about the change of address. In the months that followed, he received four allotment checks. Each was drawn to the order of Dixie D. Kirkpatrick. The accused endorsed these checks in Dixie's name and in his own name, and obtained cash. He testified he used the proceeds to pay off "some bills" and that he gave some money to Dixie. As nearly as can be determined from the accused's rambling and ambiguous testimony, the obligations he paid and the checks he used for these payments were as follows:

| Checks | Obligations Paid |
| --- | --- |
| November 30, 1966 | $20.00. Balance due for purchase of marriage band. Date of payment not specified, but the accused testified he paid the bill from the proceeds of "the first check." |
| | $129.00. Quarterly payment on life insurance policy for the period from December 1966 to the end of March 1967.[2] Paid before due date. |
| | $73.00. Cash to Dixie between the beginning of November and the end of December.[3] |

[1] The accused was married when he was not yet twenty-one years of age. He reached that age on October 19, 1966. The parties appear to have believed that the accused could have the marriage annulled for nonage. However, the accused never instituted proceedings, and Dixie "finally realized . . . he hadn't gone to a lawyer," so she went to one herself and "started annulment."

[2] The policy had been in effect for

| | |
|---|---|
| December 30, 1966 | $50.00. Payment for three dresses for Dixie's children. The time of purchase appears to be sometime in October 1966, and the time of repayment was sometime from "December 1, '66 to the end of March of 1967." |
| January 30, 1967 | $36.00 or $39.00. Payment of Los Angeles motel bill incurred about September 1966. Payment made in February 1967. |
| February 28, 1967 | $80.00. Repayment of "personal debt" to friend for expenses of trip to Las Vegas. The time of repayment does not appear in the record. |

At trial, Dixie denied she gave the accused authority to sign her name to the checks. She also testified that she paid all the household bills during the time the marriage remained in effect and that, until the accused left her, she gave him money for lunch and transportation to the base.

As explained by individual defense counsel, the theory of defense was that the accused cashed the checks, and used the proceeds, for the purpose of paying "community obligations." In support of the theory, the accused testified that he "had no intent to defraud" and all he wanted to do was "to pay off . . . debts . . . that . . . [he] went into when . . . [he] got married." Special instructions were given on that issue, and the court members were informed that community property could "properly be used . . . to defray the debts of the marriage." The findings of guilty demonstrate the issue was decided against the accused. Appellate defense counsel challenge the legality of the findings.

Two separate contentions are advanced for dismissal of the charges. First, appellate defense counsel contend that the allotment originates from the accused's services and he, therefore, has a sufficient property interest in each allotment check to preclude prosecution for forgery of his wife's name. Secondly, counsel contend that, as domiciliaries of California, Dixie and the accused were subject to the State's community property laws which empower the husband to manage and control the community property and, therefore, the checks "could not be the object of forgery." We consider these contentions sequentially.

A member of the armed services entitled to basic pay is also "entitled to a basic allowance for quarters" at specified monthly rates, graduated according to rank and whether or not he has dependents. 37 USC § 403(a). Payment of the allowance is subject to certain conditions, and it is handled differently for different ranks. Persons above the rank of E-4 with four years of service may be paid the allowance directly. However, a person in the lower ranks who has a dependent must institute an allotment for the dependent in an amount "not less than the sum of the basic allowance for quarters to which he is entitled plus $40"; the allotment payment is sent directly to the dependent, not the serviceman. 50 USC Appendix, § 2204; Senate Report No.

sometime before the marriage. The accused maintained he substituted Dixie as beneficiary, in place of his parents, in October 1966, and renamed his parents as beneficiaries in March 1967.

[3] Dixie testified that the only money she received from the accused was $30.00 in October, which was used to celebrate the accused's birthday on October 19, 1966, and $20.00 in November, which was repayment of a loan she had made to the accused "for his sister's birthday." The time the loan was made was not specified.

1579, June 11, 1962, to accompany H. R. 11221, 87th Congress, Second Session, 1 United States Code Congressional and Administrative News, pages 1901–1902, 1962. The allotment check is thus made up of two parts of the total compensation paid to a serviceman in the accused's rank. The first part is $40.00 from base pay, and the second part is the allowance for quarters granted by 37 USC § 403. The cited Senate Report on the statutory scheme indicates a Congressional purpose to confer upon the dependent a measure of control over the check. In other words, the fact that the allowance has its origin in emoluments of the serviceman does not give him absolute and exclusive dominion and control over the allotment payment. United States Code Congressional and Administrative News, supra, at page 1902. The Comptroller General of the United States has so construed the statutes. In an unpublished ruling, called to our attention by appellate Government counsel, the Comptroller General held that when a serviceman " 'makes a class Q allotment for the support of his wife, the amounts involved no longer are regarded as belonging to him to the same extent as the remainder of such pay and allowances.' " Comp Gen B-143612, October 24, 1960. A similar construction underlies several opinions by this Court dealing with forgery by the serviceman of allotment checks drawn to the order of his dependent spouse.

In United States v Wooldridge, 10 USCMA 510, 513, 28 CMR 76, we noted that the former allotment statute provided that "the dependent . . . shall be entitled to receive a monthly family allowance"; this provision was changed by Congress to give the serviceman an allowance for quarters. While determination of the exact significance of the change was not necessary to our decision, our discussion of the serviceman's interest in the check indicated that the dependent-spouse also had an interest in it which was greater than that of a mere nominee of, or conduit for, the serviceman. In United States v Wise, 10 USCMA 539, 28 CMR 105, we again adverted to the spouse's interest in the allotment. Without defining its precise

306

nature, we held that the interest could be voluntarily surrendered by the spouse so as to give the serviceman sole and exclusive dominion and control over the check. In United States v McFerrin, 11 USCMA 31, 28 CMR 255, the accused was convicted of larceny and forgery of an allotment check sent to his wife. The Court set aside the conviction because of the lack of independent evidence to corroborate the accused's confession, but the Court's opinion clearly indicated that the dependent-spouse has a property interest in the check of which she can be defrauded by her husband-serviceman through forgery of her signature.

So far as we have been able to determine from the regular reports, only one Federal civilian case has dealt with the problem. In United States v Ryno, 130 F Supp 685 (SD Cal) (1955), affirmed, 232 F2d 581 (CA9th Cir) (1956), the defendant, as the accused here, was charged with forging the signature of his wife to an allotment check issued to her. He contended that the allotment represented compensation to him, and was, therefore, his sole property. The United States District Court rejected the contention, as follows:

"Defendant also contends that since allotment allowances for dependents are made by the United States in consideration of the husband's serving in the Armed Forces, they are compensatory in nature and come into the marriage as earnings of the husband. Statutes of Colorado have been cited to show that in that State the husband's earnings are his separate property, subject to his control. He contends that therefore he was dealing rightfully with his own property.

"The particular check was issued by the Government for a special purpose. It was never the purpose of a serviceman's allotment that he be thereby personally enriched. It was the purpose of the Government to provide *currently* for the regularly recurring subsistence needs of the serviceman's family. When defendant intercepted the check which was

payable to his wife, and signed her name as endorser without her authority and for the purpose of receiving the funds for his personal use, he thereby acted fraudulently toward the Government and the wife, as well as all persons through whose hands the check would pass, and he committed the crimes charged in the Indictment." [United States v Ryno, 130 F. Supp, at pages 690-691.]

On appeal to the Court of Appeals for the Ninth Circuit, the conviction was affirmed. Considering the defendant's claim that in endorsing the check in his wife's name and applying the proceeds to his personal use he was dealing only with his own property, the Court of Appeals said:

"There is no merit in appellant's point that appellant had right by operation of law to endorse the check in question. To hold otherwise would, in many cases, frustrate an evident purpose of Congress to provide for dependents of servicemen and protect them against possible neglect or indifference." [Id., 232 F2d, at page 584.]

Legislative history and administrative and judicial precedents compel the conclusion that a dependent ▆▆▆▆▆▆▆▆ ▆ to whom an allotment check is issued has a cognizable interest in it. We need not define the exact nature or the legal consequences of that interest. Suffice it to hold, as we now do, that the serviceman cannot by his own act defraud a dependent-spouse to whom an allotment check is issued of her special interest in it. We pointed out in United States v Wooldridge, supra, at pages 513–514, that the accused also has a special interest in the check, but the conjunction of interests in an article of property does not give the owner of one such interest the right to defraud the other of his interest. State v Sotak, 100 W Va 652, 131 SE 706 (1926); State v Arnett, 338 Mo 907, 92 SW 2d 897 (1936). It is thus apparent that the Federal statutes providing for the allotment sanction, rather than preclude, prosecution for forgery where, with the intent to defraud, the serviceman forges his wife's name to an allotment check issued to her.

We turn now to consider the effect of the California community property laws. Although it may be obvious, it is worth noting that we are dealing with forgery as defined in Article 123 of the Uniform Code of Military Justice, supra, not as it is defined by California law. See United States v Nardello, 393 US 286, 21 L Ed 2d 487, 89 S Ct 534 (1969). Article 123 defines as forgery the making of a false writing which has apparent legal efficacy to prejudice another in his legal rights. Appellate defense counsel contend that, under section 172 of the Civil Code of California, the husband has authority to manage and control community property "'with like absolute power of disposition . . . as he has of his separate estate,'" so that the accused's handling of the check could not, as a matter of law, prejudice his wife. The first question presented by the contention is whether the allotment is community property.

United States v Mitchell, 11 CMR 924, 925, cites a United States Treasury ruling (I. T. 3574, CB 1942-2-52), to the effect that for the purpose of internal revenue laws the allotment is a "gift," not taxable income. On the other hand, the Court of Appeals for the Ninth Circuit has held that where the marital domicile is in a community property state, the law of that state determines whether the allotment is a

---

[4] Under California law, an oral premarital agreement may change the status of particular property from separate to community. Handley v Handley, 113 Cal App 2d 280, 248 P2d 59 (1952). It will be recalled that Dixie testified she and the accused "planned" the allotment as part of their marital "financial affairs"; his planning may have been sufficient to convert their respective interests in the allotment into a community interest. Geller v Geller, 115 Cal App 2d 822, 253 P 2d 52 (1953). Also under California law, it appears that all compensation for services rendered by the husband is community property. Strohm v Strohm, 182 Cal App 2d 53, 5 West's Cal Rptr 884, 889 (1960).

gift to the dependent-spouse or part of the community property; it determined that the allotment was community property in the State of Washington. United States v Elfer, 246 F 2d 941 (CA 9th Cir) (1957). In United States v Perkins, 8 CMR 855, 859, a board of review indicated that, as to Texas domiciliaries, the allotment was under Texas law "common property." Our analysis of California law tends to the conclusion that California would treat the allotment as community property.[4] We need not, however, decide the matter. For the purpose of this appeal, we assume the allotment is community property.

California provides that the respective interests of the husband and wife in community property are ■ "present, existing and equal interests." Civil Code, § 161a, West's Annotated California Codes; Siberell v Siberell, 214 Cal 767, 7 P 2d 1003, 1005 (1932). The husband has management and control over the community property, but he cannot "rob . . . [the wife] of every vestige of interest in ·the community property with which the· law has expressly invested her" in order to enrich his separate estate. Provost v Provost, 102 Cal App 775, 283 Pac 842, 844 (1929); Strohm v Strohm, 182 Cal App 2d 53, 5 West's Cal Rptr 884 (1960). He can be held to account for "misappropriation" of the community property in civil proceedings by the wife. Falk v Falk, 48 Cal App 2d 762, 120 P 2d 714, 718 (1941). Misconduct with respect to community proceeds may also subject the husband to criminal prosecution. In People v Crowder, 126 Cal App 2d 578, 272 P2d 775 (1954), the defendant signed his wife's name to four checks and was charged with forgery. At trial, he contended the money represented by the checks constituted community property over which he had full control, but he was convicted. The conviction was reversed on appeal on the ground the evidence demonstrated the money had been used for "needs of the family," and it did not convincingly appear that in signing the checks the husband had the requisite intent to defraud. Id., at page 780. However, in addressing itself to the validity of the prosecution as a matter of law, the court said:

". . . The fact that the bank account was community property did not give defendant the right to sign his wife's name to checks but it had a most significant bearing upon his motives. If defendant had ·made off with community funds under circumstances which indicated that he intended thereby to cheat and defraud his wife of her community interest therein an entirely different question would have been presented." [Id., at page 779; see also People v Suciu, 218 Cal App 2d 888, 32 West's Cal Rptr 645 (1963); cf. Kiekhoefer v United States Nat. Bank of Los Angeles, 2 Cal 2d 98, 39 P2d 807, 811 (1934).]

It is apparent, therefore, that California law as to the respective interests of the husband and wife in community property does not bar prosecution of the accused for forgery of an instrument affecting community funds.[5]

In the third assignment of error, appellate defense counsel challenge the correctness of the post-trial review by the staff legal officer.. In a section of the review discussing the evidence, the staff legal officer made the following comments:

"The stipulations of counsel and the uncontroverted evidence establish the first two of the enumerated elements. The case was defended on the theory that the accused did not have an intent to defraud. Because the alleged forgery is set against the background of the break-up of a marriage, much of the testimony is of a type more commonly heard in civilian domestic relations courts·than Navy

---

[5] Our conclusion on this point makes it unnecessary to consider the holding in United States v Ryno, 130 F Supp 685 (SD Cal) (1955), affirmed, 232 F2d 581 (CA9th Cir) (1956), that the United States Government has an interest in the allotment check which can be affected by the serviceman's forgery of his wife's signature.

courts-martial. This background is significant both as it may shed light on the accused's intent and as it may affect the credibility of the accused or Miss Spence. The amount of support given and received is not clear from the substantial amount of contradictory evidence in the record. It is felt that resolving these conflicts would not really bring the accused's intent into clearer focus. What is felt to be significant is that the accused cashed the allotment checks without even advising the named payee of the existence of these checks. Is not obtaining something of value by deceiving or misleading another the very essence of a fraud, and must not the accused have intended the obviously foreseeable results of his acts? The fact that the funds may have been used in part or in total to retire obligations connected with the marriage is felt to be something most properly considered in mitigation."

The advice is wrong. As the instructions to the court members indicated, and as People v Crowder, ▮ supra, at page 777, specifically observed, the use the accused made of the proceeds of the checks "was the very heart of the case." To the extent the proceeds were used for the marital community, the use tended to negate the existence of an intent to defraud. See also United States v Wooldridge, supra, at page 515. It was, therefore, important to consider that question. The court-martial had decided the issue against the accused, but the supervisory authority could make new findings of fact. Article 65, Code, supra, 10 USC § 865; Manual for Courts-Martial, United States, 1951, paragraph 94.

Misadvice in the post-trial review is reversible error when there is fair risk the accused was prejudiced. United States v Hooper, 11 USCMA 128, 130, 28 CMR 352. Here, the accused's testimony as to the disposition of the proceeds of the several checks demonstrates beyond all doubt that, except possibly for payment of $50.00 for the children's dresses, the proceeds of the December, January, and February checks were used to pay personal and premarital obligations. The Los Angeles motel bill was incurred about September 1966, when the parties were not yet married and the accused did not even want to get married. He testified that up to the day before the marriage, not only were his parents opposed to it, but he, too, "was against it." He further testified that on the morning before the marriage, Dixie accused him of not loving her; and she maintained that if he did love her, he would marry her. Her accusations and remonstrances continued for "about two hours"; then, he agreed "to go to Las Vegas and get married." The motel debt, therefore, was plainly the accused's; and he indicated in his testimony that he knew the bill was his own "obligation." Similarly, the loan the accused purportedly obtained from a friend was his separate debt; in fact, he described it himself as "a personal debt." Stewart v Stewart, 113 Cal App 334, 298 Pac 83, 85 (1931). Since the accused's own testimony demonstrates he used all or part of the proceeds of the January and February checks to enrich his separate estate at the expense of Dixie's interest in them as community property (People v Crowder, supra), there is no fair risk that the supervisory authority would overturn the court-martial's finding that he possessed an intent to defraud when he signed Dixie's name to these checks. So far as the November and December checks are concerned, the proceeds were used, if the accused is believed, in a way sufficiently consistent with, and appropriate to, legitimate management of the community property, as to negate the existence of an intent to defraud.[6] As to

---

[6] Since the accused's policy of insurance was in force before the marriage and appears not to have been the subject of an agreement that it be community property, it remained his separate property after the marriage. In re Lissner's Estate, 27 Cal App 2d 570, 81 P 2d 448 (1938); Provost v Provost, 102 Cal App 775, 283 Pac 842 (1929). However, if the accused's testimony as to the change of beneficiary is believed, it can reasonably be concluded that he did not intend to defraud when

these offenses, therefore, the staff legal officer's erroneous advice was prejudicial.

Considering the length of time that has elapsed since completion of the trial proceedings and the unimpeachability of several of the findings of guilty, we deem it advisible not to return the record of trial to the supervisory authority for further action, but to bring the case to a close as speedily as possible. Accordingly, we reverse the decision of the board of review as to specifications 1 and 2 of Charge II, set aside the findings of guilty pertaining thereto, and dismiss the specifications. We return the record of trial to the Judge Advocate General of the Navy for submission to the board of review for reassessment of the sentence on the basis of the remaining findings of guilty.

Judges FERGUSON and DARDEN concur.

---

he cashed the November check to pay the quarterly premium on the policy.

See Ayoob v Ayoob, 74 Cal App 2d 236, 168 P 2d 462 (1946).